

FILED
APR 10 2009
CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | \* | CR 08-10033 |
| | \* | 2008 D.S.D. 5 |
| Plaintiff, | \* | |
| -vs- | \* | OPINION AND ORDER |
| DURAN R. RICHOTTE, | \* | |
| Defendant. | \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

## BACKGROUND

[¶1] An indictment was filed charging the defendant with assaulting, resisting, or impeding a federal law enforcement officer and with inflicting bodily injury upon the officer in violation of 18 U.S.C. §§ 111(a)(1) and (b). Following his initial appearance, the defendant filed a motion to dismiss the indictment pursuant to the Interstate Agreement on Detainers Act ("IADA"), 18 U.S.C. Appdx 2. An evidentiary hearing was held on the motion on January 5, 2009.

[¶2] Defendant was indicted on September 10, 2008, and an arrest warrant issued commanding the United States Marshal and any authorized United States Officer "to arrest Duran R. Richotte and bring him forthwith to the nearest magistrate" to answer the indictment. The defendant was at that time in the custody of the Sisseton Wahpeton Sioux Tribal Court. The federal prosecutor did not request a writ of habeas corpus ad prosequendum to effect the defendant's release from tribal custody. The FBI did notify Captain Gaikowski of the tribal police department, requesting that he contact the FBI prior to Richotte's release. That release was expected on November 17, 2008. Unknown to Gaikowski, the defendant had already been released from tribal custody.

[¶3] Defendant was taken into South Dakota state custody on November 15, 2008, and held in the Roberts County jail. His detention was effected pursuant to a bench warrant for, inter alia,

failure to pay a fine. On November 16, an agent of the Federal Bureau of Investigation ("FBI") contacted Roberts County and advised that "they want him after we are through with him." The federal prosecutor did not request a writ of habeas corpus ad prosequendum to effect the defendant's release from state custody, once again because the FBI had not requested him to do so. These writs are commonly presented to federal judges in the District of South Dakota.

[¶4] On November 18, 2008, state court magistrate Mark Anderson, sitting in SIsseton, Roberts County, South Dakota, sentenced the defendant to five days custody on unrelated charges and ordered Richotte to "sit out" the outstanding fine at the rate of $40 per day. On November 20, 2008, Judge Anderson issued a written order memorializing his prior oral ruling that "any jail sentence imposed that was required to be served may be done while in custody of the United States Government pursuant to Federal Charges." Judge Anderson also ordered that Richotte "may be released into the custody of the United States government." This order, however, had nothing to do with the Roberts County jail releasing Richotte from state custody to the FBI agent. The order was not entered until after the federal hearing had already been held. The jailer released Richotte to the FBI because the FBI had a federal warrant for Richotte's arrest.

[¶5] The FBI agent did take custody of Richotte on November 20, 2008. He thereafter notified the federal clerk's office in Pierre, S.D. that he had the defendant in custody and was bringing him to Aberdeen, S.D., for an initial appearance before a magistrate, as he was required to do by the terms of the warrant and by Fed. R. Crim. P. 5(a)(1). The Aberdeen federal magistrate was unavailable and my law clerk was contacted to inquire whether the defendant could be taken to another division for an initial appearance. I was contacted (at home) and denied the request to take the defendant to another division. My law clerk made arrangements to bring the defendant before a state court judicial officer as allowed by Fed. R. Crim. P. 5(a)(1)(A). That officer happened to be Magistrate Anderson.

[¶6] My law clerk became aware that the defendant had been released from state custody upon the promise that he be returned to finish "sitting out" his fines. She raised concerns that a return to state custody may violate the IADA's anti-shuttling provisions. The FBI agent inquired whether he should immediately return the defendant to state custody and was advised that, since

the defendant was now in federal custody, the law required that he be brought without unnecessary delay before a magistrate. The FBI agent had contact prior to the initial appearance with the prosecutor and relayed the law clerk's legal concerns.

[¶7] My law clerk contacted Magistrate Anderson and advised him of her IADA concerns. She prepared a written memorandum to the magistrate judge wherein she explained the anti-shuttling provisions and advised "in an abundance of caution" that the defendant be requested to request a transfer back to state custody, thereby waiving the anti-shuttling provisions. The prosecutor was also given a copy of that memo prior to the defendant's initial appearance. I have since cautioned my law clerk that she should not be providing legal advice to anyone other than me.

[¶8] The defendant was released following that hearing and went back to his attorney's Aberdeen office. The FBI agent had understood that the defendant would be getting a ride back to Sisseton, S.D. from a family member.

[¶9] The FBI agent did not recall that any conditions of release were orally set forth at the initial appearance. However, a formal order setting conditions of release was entered, which order required, as a condition of release, that the defendant "continue to satisfy any state court-ordered fines, restitution or court costs." This directive is not a standard provision of any order by a federal magistrate releasing a federal prisoner. The directive was hand written by Judge Anderson. The federal prisoner was released only upon the condition that he return to state custody. Defendant signed to verify his knowledge of this order on November 20, acknowledging that he was aware of the conditions of release and promising to obey those conditions. The defendant self-reported back to the Roberts County jail on November 20, 2008, approximately eight hours after he had been taken into custody by the FBI. The order of release clearly ordered Richotte to return to state custody. He did so and was held in state custody until November 27, 2008, when he completed his state sentence.

[¶10] A formal "detainer" form exists and has been used by the United States Marshals Service in the Northern or Central Divisions of the District of South Dakota, although very infrequently. The FBI agent in this case rarely uses a formal detainer. No formal detainer was lodged in this case.

[¶11] Roberts County Detention Facility staff fully expected that the defendant would be returned to state court custody following his initial appearance in federal court in Aberdeen. If the defendant had not returned to state custody, the jailer would have notified the Robert's County State's Attorney. Both the FBI and the sheriff assumed that the defendant's failure to return to custody would have been tantamount to escape.

## DECISION

[¶12] "Article IV [of the IADA] provides the means by which a prosecutor who has lodged a detainer against a prisoner in another State can secure the prisoner's presence for disposition of the outstanding charges." United States v. Mauro, 436 U.S. 340, 351, 98 S.Ct. 1834, 1843, 56 L.Ed.2d 329 (1978). The prosecutor may obtain custody of the prisoner by filing a detainer and making a written request for temporary custody of the prisoner. Art. IV(a). Article IV(e) of the IADA provides:

> If trial is not had on any indictment, information, or complaint contemplated hereby prior to the prisoner's (sic) being returned to the original place of imprisonment pursuant to article V(e) hereof, such indictment, information, or complaint shall not be of any further force or effect, and the court shall enter an order dismissing the same with prejudice.

[¶13] Article IV(e) is commonly referred to as the "**anti-shuttling**" provision of the IADA. "The Agreement requires the dismissal of an indictment against a prisoner whose custody is obtained by a receiving state . . . if he is returned to his original place of imprisonment without first being tried on the indictment underlying the detainer and request by which custody of the prisoner was secured." United States v. Bruton, 647 F.2d 818, 821 n. 1 (8th Cir. 1981).

### I. Detainer.

[¶14] IADA contains no definition of the word "detainer."

> The House and Senate Reports, however, explain that "[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence, advising that he is wanted to face pending criminal charges in another jurisdiction." H.R.Rep. No. 91-1018, p. 2 (1970); S.Rep. No. 91-1356, p. 2 (1970); U.S.Code Cong. & Admin.News 1970, p. 4865.

United States v. Mauro, 436 U.S. at 359, 98 S.Ct. At 1846.

> The handbook on Interstate Crime Control of the Council of State Governments (1949) contains a report of the joint committee on detainers, stating in part: "A detainer may be defined as a warrant filed against a person already in custody with the purpose of insuring that, after the prisoner has completed his present term, he will be available to the authority which has placed the detainer. Wardens of institutions holding men who have detainers on them invariably recognize these warrants and notify the authorities placing them of the impending release of the prisoner." (page 85)

United States v. Thompson, 562 F.2d 232, 238 (3rd Cir. 1977) (dissenting opinion).

[¶15] A formal written "detainer" using the form received in evidence was never filed with Roberts County. Several courts have stated, without discussion, that an arrest warrant, in effect, may be treated as a detainer. *See* Lehn v. Holms, 364 F.3d 862, 864-65 (7th Cir. 2004) (Maryland arrest warrant was lodged as a detainer); United States v. Dent, 149 F.3d 180, 184-85 (3rd Cir. 1998) (prosecutors wrote to the U.S. Marshals Service requesting that Dent's federal arrest warrant be lodged as a detainer with the correctional facility where Dent was incarcerated); Kearns v. Turner, 837 F.2d 336, 337 (8th Cir.1988) (Missouri warrant was lodged as a detainer); Edwards v. United States, 564 F.2d 652, 653 (2nd Cir. 1977) (a warrant for defendant's arrest was lodged as a detainer at the Manhattan House of Detention (Riker's Island) where Edwards was confined pending trial on state criminal charges); United States v. Ford, 550 F.2d 732, 735 (2nd Cir. 1977) (the federal warrant issued by the Southern District for bank robbery was lodged with the Massachusetts authorities as a detainer); Baez v. Ebbert, 2008 WL 2845069, 1 (D.N.J. 2008) (Essex County Sheriff lodged a detainer against the prisoner in the form of warrant for his arrest on a pending New Jersey criminal charge); Whiteley v. Attorney General State of Connecticut, 2007 WL 1892309, 5 (D.N.J. 2007) (petitioner challenged the BOP's treatment of the faxed warrant as a detainer). *But see*, United States v. Fulford, 825 F.2d 3, 10 (3rd Cir. 1987) (an arrest warrant is not a detainer).

[¶16] Arrest warrants may present the same evils addressed by the IADA.

> The central problem with detainers was that they could be lodged against a prisoner and remain there for a very long time without any action being taken upon them. This could substantially impair a prisoner's privileges and opportunities for rehabilitation. Thus, the Agreement was designed to insure expeditious disposition of charges underlying a detainer.

State ex rel. Bailey v. Shepard, 584 F.2d 858, 862 (8th Cir. 1978) *(citing* United States v. Mauro, 436 U.S. 340, 359, 98 S.Ct. 1834, 1846-47, 56 L.Ed.2d 329 (1978)). The use of extradition warrants or the federal writ of habeas corpus ad prosequendum does "not create the hazards to prisoners which the Agreement was designed to prevent." *Id.* However, arrest warrants that are "lodged as detainers" do present the same hazards as detainers.

[¶17] The United States Court of Appeals for the Fourth Circuit has discussed this issue:

> At the outset we note that the parties to this action have assumed that the fugitive warrants issued against Kerr while he was incarcerated in Chowan County, North Carolina, served as a detainer within the meaning of the IADA. Although the IADA does not define the word "detainer," the legislative history of the IADA states that "[a] detainer is a notification filed with the institution in which a prisoner is serving a sentence advising that he is wanted to face pending criminal charges in another jurisdiction." H.R.Rep. No. 91-1018, S.Rep. No. 91-1356, 91st Cong., 2d Sess. 3, reprinted in 1970 U.S.Code Cong. & Ad.News 4864, 4865 (emphasis added). The record in this case is not clear with respect to whom the fugitive warrants were delivered and how Kerr received notice of the warrants. A review of the warrants shows that they were issued in Chowan County, North Carolina, by the Clerk of Superior Court of that County on the basis of arrest warrants received from Spotsylvania County, Virginia. The fugitive warrants were addressed "TO THE SHERIFF OF CHOWAN COUNTY OR OTHER LAWFUL OFFICER OF NORTH CAROLINA." They listed the felonies for which Kerr was wanted in Spotsylvania County and commanded the recipient(s) "to arrest the said PATRICK W. KERR, and keep him safely in order that he may be dealt with as law directs, UNTIL SAID DEFENDANT IS TURNED OVER TO The Commonwealth of Virginia." The question of whether the fugitive warrants issued against Kerr served as a detainer has not been raised in this case. Therefore, we do not address the issue, but merely assume, for the purposes of this opinion only, that they did function as a detainer.

Kerr v. Finkbeiner, 757 F.2d 604, 606 fn. 2 (4th Cir. 1985).

[¶18] The Seventh Circuit has held: "To show that a detainer has been 'filed' there must be, at a minimum, proof that authorities from the charging jurisdiction notified the authorities where the prisoner is held that the prisoner is wanted to face charges." United States v. Weaver, 882 F.2d 1128, 1133 (7th Cir. 1989). That clearly occurred here. In fact, in addition to oral notification, the Roberts County Sheriff had in his possession the arrest warrant issued by this Court showing the FBI agent's authority to take the defendant into custody.

[¶19] Article IX of the IADA requires courts to liberally construe its provisions so as to effectuate its purposes.

**II. Request.**

[¶20] In addition to filing a detainer, the IADA requires that the receiving state make a request for release. That request was oral in this case. Judge Anderson at some point issued an order authorizing the Roberts County jail to release the defendant for his federal court appearance. While Judge Anderson may have had authority to authorize the defendant's release from state custody, such authority does not have any impact on whether the anti-shuttling provisions of the IADA were violated when the defendant was returned to state custody.

**III. Return.**

[¶21] The United States Court of Appeals for the Tenth Circuit has explained that

> Article IV(e) applies when the prisoner is "returned . . . to the original place of imprisonment pursuant to article V(e)." IAD (emphasis added). Article V(e) provides that, "[a]t the earliest practical time consonant with the purposes of this agreement, the prisoner shall be returned to the sending State." Id. Read together, these words suggest that the prisoner must be sent back to recommence serving his original sentence to trigger the anti-shuttling provision. Under Article V(e), a prisoner should be returned to the sending state to resume his original sentence following the disposition of the receiving state's trial.

United States v. Pursley, 474 F.3d 757, 764 (10th Cir. 2007). This Court must determine whether, by the conditions of release, the defendant was "returned" to state custody prior to conclusion of the federal charges. I find that he was.

[¶22] The defendant was under the altogether reasonable impression after his initial federal appearance that he would be arrested for escape if he did not return to state custody.

**IV. Waiver.**

[¶23] The protection of the Agreement's "anti-shuttling" provisions may be waived by the defendant's request for a retransfer prior to disposition of the outstanding charges. Articles III(d) and IV(e). See New York v. Hill, 528 U.S. 110, 117-18 (2000). "[A] prisoner may waive his rights under the Interstate Agreement on Detainers Act," and does so when he requests transfer back to the state prison. Gray v. Benson, 608 F.2d 825, 827 (10th Cir. 1979). In this case, Richotte was released following his initial appearance on the federal warrant. One of the

conditions of release was that he pay all outstanding state court fines. The magistrate judge knew that the defendant had earlier been ordered to "sit out" his outstanding fines at the rate of $40 per day for each day he served in custody in the Roberts County jail. The magistrate judge knew very clearly what he was ordering the defendant to do.

[¶24] The defendant returned to state court custody but he was not transported by law enforcement. "All the circuits that have reached the issue have held that the rights under Article IV(e) are waived by a prisoner's request to be returned to his original place of imprisonment." Webb v. Keohane, 804 F.2d 413, 414-15 (7th Cir.1986). "[T]he purpose of Article IV(e) is to benefit the prisoner by allowing continuous rehabilitation in one location, but the prisoner can decide he prefers the benefits of being transferred elsewhere." Id. at 415. The question is whether the defendant acted in a manner inconsistent with the provisions of the IAD when he returned to state custody or whether he returned because he was ordered to do so. There is no doubt that neither the defendant nor his attorney made any request to return to state custody. He returned because he was ordered to do so.

## V. De Minimis Violation.

[¶25] The government contends that, even if there was a technical violation of the IADA, such violation was only for approximately eight hours. Such a deminimis violation, the government argues, does not violate the spirit and purpose of the anti-shuttling provisions. However, the United States Supreme Court rejected an argument that a one-day interruption is "technical," "harmless," or "de minimis" in Alabama v. Bozeman, 533 U.S. 146, 153, 121 S.Ct. 2079, 2084, 150 L.Ed.2d 188 (2001).

## VI. Remedy.

[¶26] Article IX § 9 of the IADA provides:

> Notwithstanding any provision of the agreement on detainers to the contrary, in a case in which the United States is a receiving State-
>
> > (1) any order of a court dismissing any indictment, information, or complaint may be with or without prejudice. In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: The seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the

> administration of the agreement on detainers and on the administration of justice; and
>
> (2) **it shall not be a violation** of the agreement on detainers **if** prior to trial **the prisoner is returned to the custody of the sending State pursuant to an order of the appropriate court issued after reasonable notice** to the prisoner and the United States and an opportunity for a hearing.

[¶27] No notice of any kind was provided to the prisoner and Article IX § 9(2) has no application to this case.

[¶28] The United States has violated the IADA and the indictment must be dismissed.

[¶29] The question remains: should the dismissal be with or without prejudice? The court is obviously required to consider the factors set forth in Article IX §9(1). As to the "seriousness of the offense", that is unknown since the defendant is presumed to be innocent. The indictment alleges that he assaulted a tribal police officer, a federal officer, with a knife and actually inflicted bodily injury on the officer. The allegations are far beyond the more typical assault on a federal officer case where the conduct is akin to resisting arrest. The allegations would point to a dismissal without prejudice. I have already outlined the "facts and circumstances of the case" which will lead to the dismissal. It was rather astounding that the FBI agent has never had any training as to the IADA and the consequences of violating it. The county jail clearly had no business turning over the prisoner to the FBI based on the federal warrant and in the absence of a written order from a judge directing the release. Clearly, the FBI agent should have been acting under the guidance of an attorney rather than free lancing such important matters. These factors point to a dismissal with prejudice. The last factor is the "impact of a reprosecution on the administration of the agreement on detainers and on the administration of justice." This is the first case I have had dealing with a violation of the IADA. One would think that the government would have learned a lesson here but that remains to be seen.

[¶30] The defendant, while on bond, paid absolutely no attention to what he had been told to do by the magistrate and what he was being told by the supervising probation officer. As a result, his bond was revoked and he has been held in custody since his arrest just prior to his court

appearance on February 9, 2009. The actions of the defendant would point to a dismissal without prejudice.

[¶31] Considering all the factors, the dismissal should be without prejudice. Obviously, the government may well decide to not seek another indictment, given all the facts and circumstances.

[¶32] Now, therefore,

[¶33] IT IS ORDERED that the motion to dismiss indictment, Doc. 11, is granted. The indictment is dismissed without prejudice.

Dated this 10th day of April, 2009.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK
BY: Barbara J. Graebe
DEPUTY
(SEAL)